**SMITH v. HALL et al. \***

**No. 251.**

Circuit Court of Appeals, Second Circuit.

April 6, 1936.

\*Writ of certiorari granted 56 S.Ct. 947, 80 L.Ed. ——.

[1] Claim 1 reads: The method of hatching a plurality of eggs by arranging them at different levels in a closed chamber having restricted openings of sufficient capacity for the escape of foul air without undue loss of moisture and applying a current of heated air, said current being created by means other than variations

Arthur E. Paige and Frank E. Paige, both of Philadelphia, Pa., for appellants.

Albert L. Ely, of Akron, Ohio, Edmond M. Bartholow, of New Haven, Conn., and Geo. C. McConnaughey, of Cleveland, Ohio, for appellee.

Before MANTON, SWAN, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

This suit is for infringement of claim 1[1] of patent No. 1,262,860, issued April 16, 1918, on an application filed October 26, 1916, for a method for the incubation of eggs. This claim was held valid and infringed in Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721, and Waxham v. Smith, 294 U.S. 20, 55 S.Ct. 277, 79 L.Ed. 733. It embraces a method of hatching which makes it possible to increase the capacity of an incubator to many thousands by the combination of two major steps. Instead of setting the entire capacity of an egg chamber at one time, the inventor proposed to fill the chamber with

of temperature and of sufficient velocity to circulate, diffuse and maintain the air throughout the chamber at substantially the same temperature, whereby the air will be vitalized, the moisture conserved and the units of heat will be carried from the eggs in the more advanced stage of incubation to those in a less advanced stage for the purpose specified.

successive settings, preferably three or four days apart, so that, when the chamber was filled, it contained eggs in different stages of incubation, some in the endothermic phase and some in the exothermic phase. Smith propelled a strong draft of properly heated air over the eggs thus set in staged incubation "with sufficient velocity to circulate, diffuse, and maintain the air throughout the chamber at substantially the same temperature." In this way, the heat-generating property of the further advanced eggs is offset by the heat-absorbing properties of the less-advanced eggs, so that there is a continuous tendency to equalize the temperature throughout the cabinet at approximately the temperature of the introduced current of air.

However, this record differs from those before the Supreme Court in Smith v. Snow and Waxham v. Smith, supra, for here appellants have offered evidence of prior public use of the patented method and knowledge thereof by Milo Hastings. He had been a poultryman for the Department of Agriculture in 1908 and 1909, traveling extensively and visiting poultry plants and experimental stations operating incubators. In 1909, the Dollar Hen, a book written by him, was published. Among other things, he described there an idea for the plan of construction and operation of a new type of hatcher. He said:

"The eggs are kept in bulk in special cases which are turned as a whole and may rest on either of four sides. At hatching time the eggs are spread out in trays in a special hatching room, which is only large enough to accommodate chicks in the amount of one-sixth of the incubator capacity, for twice a week deliverings or one-third if weekly deliveries are desired.

"There are no pipes or other sources of heat in the egg chambers. All temperature regulation is by means of air heated (or cooled as the case may be) outside of the egg rooms and forced in to the egg rooms by a motor driven cone fan, maintaining a steady current of air, the rate of movement of which may be varied at will. The air movement maintained will always be sufficiently brisk, however, to prevent an uneveness (sic) of temperature in different parts of the room."

This, it is said, was a disclosure of forced draft and staged incubation in the method of incubating and hatching eggs. It is argued that twice a week and weekly deliveries necessarily contemplate that the eggs in the eggroom would have to be of different ages and placed in staged incubation with the forced draft circulation maintaining an even temperature.

In 1910, Hastings built and operated an incubator of 6,000-egg capacity for one Davis of Brooklyn, N. Y., embodying these ideas. Drawings prepared for this trial under Hastings' supervision purport to illustrate this incubator, and original photographs with published illustrations and descriptions are in the record. Hastings, Davis, and his wife all testified that the apparatus and the method of hatching used in this incubator were such as indubitably to anticipate Smith. There can be no doubt that there was a closet chamber, in which the eggs were arranged in stacks of trays through which a current of heated air was blown by a mechanical fan. The questioned point is whether or not staged incubation was used and known there. Hastings specifically testified that it was. Davis and his wife both testified that eggs were put in the chambers as they came in, once or twice a week. We should be unwilling to accept this oral testimony if it were uncorroborated. See Barbed Wire Patent Case, 143 U.S. 275, 284, 12 S.Ct. 443, 450, 36 L.Ed. 154; Deering v. Winona Harvester Works, 155 U.S. 286, 301, 15 S.Ct. 118, 39 L.Ed. 153; General Motors Corporation v. Leer Auto Supply Co., 60 F.(2d) 902, 904 (C.C.A.2). But the necessary support is present here. An article in Poultry Culture, describing the later operations of Hastings at Muskogee, said: " * * * The moving air adds to or removes heat from the eggs with great rapidity. Because of this fact, eggs at all stages can be placed in the same trays of the Hastings Hatchery with little or no injury. Mr. Hastings hatched several thousand eggs under such conditions in his Brooklyn (Davis) plant last year." This was published before any motive for so declaring could be possible. Further indication that staged incubation was used at the Davis plant is taken from the Hastings' application for a patent, and the file wrapper relating to it. This application, No. 624,885, was filed May 3, 1911. It was designed to embody the invention practiced by Hastings at the Davis plant, and is witnessed by Mr. Davis and Isabel Carkhuff, the present Mrs. Davis. The drawing of the apparatus shows an undivided egg chamber down through which

air is driven by a fan so that it circulates through a source of heat and then is drawn through the back of the fan and again started on its circuit. There are no separate chambers shown, and in his application Hastings makes no mention of any way of providing separate chambers with different temperatures. In view of Hastings' avowed intention of incubating large numbers of eggs at the same time and his substantiated declarations that he did have the incubator at Brooklyn operating with 2,000 eggs in it, he must have had eggs of varying stages of incubation there, since it is clear that the eggs were supplied in relatively small amounts. There is in the record documentary evidence specifically pointing out the fact that staged incubation was embraced in Hastings' idea. His original application was undirected by counsel. When he met with difficulties in putting the patent through, he employed attorneys whose brief on the appeal to the three Examiners in Chief contained the following:

"The problem has been to enable the incubating operations to be carried on continuously, if so desired, with eggs at all stages of development, and with all of a vast number of eggs subjected to the same temperature and atmospheric conditions best adapted for the development of the embryo. * * *

"The simple way in which applicant overcame the difficulty was through the provision of a mechanically operated air forcing means which would force a rapid circulation of air through the whole collection of eggs in the chamber and past the heater. The mechanical air forcing means is an essential factor; if heat is to be conserved and the conditions maintained uniform; for a circulation, which is due to differences in temperature in different portions of the circulatory system, as, for example, where the air is circulated by the effect of the heater in causing the heated air to rise and pass into or through the incubating chamber, will not answer for large collections of eggs. * * *

"In the Hastings hatchery, a current of air is blown past each and every egg at the rate of thirty feet per minute and this rapidly moving air quickly bringing the temperature of the egg to approximately that of the air. This method of heating keeps the temperature of the eggs in the advanced state of incubation down within a few degrees of that of the air, the exact difference being regulated at will by adjusting the speed of the fan. When properly adjusted the same blast of air used to heat fresh eggs does equally well for eggs in the advanced stages just as the same temperature of the body of the hen incubates the eggs at all stages of development, without recourse on the hen's part to the 'hatching fever,' erroneously supposed to explain the higher temperature of eggs at a more advanced stage of development. Owing to this fact eggs at all stages may be handled simultaneously with uniformly good results. * * * The operator of a Mechanical Draft plant may switch as much 'fresh' or outdoor air into this inner circulation as he is willing to heat. The inventor's practice is to use but a small portion of outdoor air except in cases of excessive humidity, when a large exchange of air is utilized as a simplest means of increasing evaporation. * * *

"The introduction of moisture from the mist spray nozzles in the fan boxes to increase humidity, or running in outside air to decrease it as indicated by egg weights or air cell shrinkage is sufficient for ordinary hatching practice."

The application for a patent was denied by two of the Examiners, with one dissenting. Without funds he pursued his application no further.

There can be no question that the quoted language expressed the idea later patented by Smith. The argument that "eggs in different stages may be handled simultaneously" certainly came from the inventor and not the attorneys. Although this specific point is not made in the original application filed by Hastings, his first specification was: "My invention is that of a hatchery in which I secure better ventilation and a more uniform temperature throughout the hatching chamber by substituting a forced draft for gravity drafts." In view of his avowed aim of continuous hatching in great numbers, there is implicit the idea that the eggs will not be in the same stages. And the application and file wrapper make no mention of different chambers in which eggs of equal maturity would be placed, with the consequent necessity of adjusting the temperature of the air current to the varying requirements of the different stages. In fact, he mentions "uniform ventilation and an even temperature throughout all parts of

220

the hatching chamber." We think the attorney's brief does not represent a new idea but a clarification of an old one.

■ An abandoned application can be used to clarify the character of a claimed prior use (Interurban Ry. & Terminal Co. v. Westinghouse Electric & Mfg. Co., 186 F. 166 [C.C.A.6]) although alone it might not be acceptable to establish prior use. Cf. Wright Co. v. Herring-Curtiss Co., 177 F. 257 (C.C.N.Y.1910).

■ There is uncontradicted testimony that this Davis hatchery was an operative success. It was in use during the hatching seasons of 1910 and 1911. Its discontinuance is explained by the sponsor's financial reverses and its destruction by the fact that it was built within the cellar of the leased farmhouse which Davis had to leave.

Hastings did not abandon the idea. He promptly took it up on a larger scale at Muskogee, where he built a 30,000-egg plant and embodying the same features. This ran through the hatching seasons of 1912 and 1913. It was similar to the one built for Davis in Brooklyn. Photographs of it were taken at the time of its use; articles which appeared in newspapers and technical publications, with photographs of the incubator, are in the record. The principle of a forced draft is conclusively proven, and it appears that Hastings realized that eggs in different stages of incubation could be included in the same closed circuit. Drawings of this incubator were produced and received in evidence. That this incubator used a forced draft for the distribution of heat to maintain equal temperature throughout all the eggs in the seven · separate incubating chambers, is clearly shown. In these chambers, the air which entered at the time was driven by the forced draft vertically, down toward the eggs trays and was returned by the open space beneath the trays to the fan or blower from which the circuit passed the heat or continued on a complete continuous circuit. The drawing represents the machine as described in several articles with photographic illustrations. The elec-trical contractor who installed the fans and electrical controls testified. A photograph of the motor-driven blower in the incubator and the description appeared in the Electrical World of July 6, 1912. That description disclosed the use of a motor-driven blower to force evenly heated air to all parts of the tray racks.

An album of original photographs of the motor-driven blower and the super-imposed egg trays which slide in the incubator chambers are shown. The practice of the method of Smith's patent is testified to by witnesses who saw the plant operated and who participated in its operation during the two hatching seasons.

In this operation, Hastings testified that the principle of staged incubation along with forced draft circulation was used.

Although the patent has been held valid in a number of cases, only two Circuit Courts have considered Hastings. In a prior litigation (Buckeye Incubator Co. v. Wolf, 291 F. 253 [D.C.N.D.Ohio] affirmed 296 F. 680 [C.C.A.6]), there was introduced the publication in the Dollar Hen and other publications as well as the Hastings' application and there it was found that these did not describe an anticipation of Smith's method. While the patent application is referred to, no mention is made of the brief of Hastings' patent attorneys. Hastings was not a witness, nor was any witness called to testify to what his prior use had been. In Buckeye Incubator Co. v. Cooley (C.C.A.) 17 F.(2d) 453, the same evidence was in the record, and Hastings was a witness, but the Third circuit found his testimony unconvincing and that alleged prior uses were not of Smith's method because they did not provide for a regular current of air. This is the first time the prior uses at the Davis place and at Muskogee have been so fully presented and substantiated.

On the record now before the court, it is impossible to agree that Smith's discovery was "not known or used by others in this country before his invention or discovery thereof." 35 U.S.C.A. § 31.

Decree reversed.