[redacted]

28 C.C.P.A. (Patents)

**In re BECKER et al.**

**Patent Appeal No. 4452.**

Court of Customs and Patent Appeals.

March 31, 1941.

[redacted]

[redacted]

[redacted]

[redacted]

Bailey & Larson, of Washington, D. C. (Hugo Huettig, Jr., of Washington, D. C., of counsel), for appellant.

W. W. Cochran, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

LENROOT, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office affirming a decision of the examiner rejecting, for lack of patentability in view of the cited prior art, claims 3, 4, 14 and 15 of appellants' application for a patent. No claims were allowed.

Claim 3 illustrates the nature of the subject matter involved and reads as follows: "In a process for the production of artificial gut from animal fibrous starting materials by treating the said starting materials with swelling chemicals and finally with acids, shredding the swollen material, extruding the resulting swollen fibrous masses from a nozzle containing an annular orifice and drying the resulting artificial gut by rinsing with hot air, the improvement which consists in adjusting the temperature and relative humidity of the hot, drying air that the temperature of such hot, drying air when registered by a wet thermometer of a psychrometer arranged in such drying air does not exceed 25° C. and when registered by a dry thermometer arranged in such drying air is at least 41° C., whereby the temperature of the drying artificial gut does not exceed 25° C."

The references cited are: Hulbert, 1,581,803, April 20, 1926; Samuel, 1,656,-681, January 17, 1928; Schulte, 2,039,262,

April 28, 1936; Becker, 2,056,595, October 6, 1936.

In his statement the examiner described the alleged invention as follows: "The subject matter sought to be protected is a process for producing artificial sausage casings of similar materials from fibrous pastes of protein materials swollen with water obtained from waste animal skins, etc. The fibrous paste is extruded through nozzles to form the paste in the desired shape and the shaped article is dried. The novelty on which reliance is placed is that the drying is conducted at such a temperature and humidity of drying air that the temperature of the product does not exceed 25° C."

Appellants' brief states:

"In accordance with the present invention, the applicants have devised a simple manner in which the quality of the artificial gut produced is maintained uniform. The applicants discovered that the irregularities which were found present in the artificial gut after undergoing the hardening were caused by overheating the gut during the drying treatment after the extrusion of the gut to render said product coherent.

"The applicants furthermore discovered that the temperature of the artificial gut being dried in the heated air corresponded to the wet bulb temperature of the heated drying air and not the actual temperature of the drying air, or, namely, the dry bulb temperature thereof. The wet bulb temperature of air is measured by a thermometer wherein the element measuring the temperature is surrounded by a moist material, such as, for example, a lamp wick which constantly absorbs water from a reservoir provided therefor. The rate of evaporation of the moisture from the wick which causes cooling determines the temperature recorded by the thermometer, and this rate of evaporation depends upon the actual temperature of the surrounding air as well as the relative humidity of the surrounding air. The relative humidity of air is the amount of moisture in the air with reference to the amount of moisture that could be held in the air at the temperature in question. In other words, if at a certain temperature the relative humidity of air is 50%, it means that the air contains only 50% of the moisture which it might contain when completely saturated.

"The applicants furthermore discovered that the actual temperature of the heated drying air did not affect the quality of the artificial gut so long as the temperature thereof, when registered by a wet bulb thermometer, did not exceed 25° C. Consequently, drying air having a relatively high actual temperature with respect to the desired 25° C. in the drying gut may be employed if the relative humidity in the drying air is low. For example, as may be seen from the table given on page 7 of applicants' specification (page 8 of the Record), a temperature of 59° C. or approximately 138° F. may be employed without having the temperature of the drying gut exceed 25° C. or 77° F."

The patent to Hulbert relates to a method controlling the moisture content of leather. It states that the treatment applies to "animal fibres such as hides and leather." The patent further states:

"Removal of moisture is, of course, much accelerated by heat; but as warming air decreases the relative humidity, it is necessary, for my purposes, to add somewhat more water vapor when warmed air is used. * * *

*       *       *       *       *

"I have found that good results cannot be obtained by using raw unconditioned air nor by using water for moistening, that uniform accurate results can only be obtained in controlling the moisture content of leather by use of air at fixed predetermined temperatures and containing constant predetermined amounts of moisture. The air so prepared must be applied to the leather uniformly and in such a manner as to gently but uniformly wash over the entire surfaces of the leather.

*       *       *       *       *

"I have discovered that the ability of the air to extract or deposit moisture in leather is dependent not alone on the temperature or relative humidity but on the combination of the two, and that where I desire to diminish the moisture content of leather the best results are obtained if the air has a temperature varying from 80 to 95 degrees F. and a moisture content from 35 to 45 per cent relative humidity. Where it is desired to have the leather take up moisture from the air I find best results are obtained by having temperatures of 80 to 85 degrees F. and a relative humidity of 93 to 97 per cent. Where such conditions are made to obtain the effect upon the leather is rapid and uni-

form and the resulting leather is entirely homogeneous as regards moisture content."

The patent to Samuel relates to the manufacture of artificial skins for sausages. The material utilized consists of "animal waste substances of any suitable kind, particularly those, which are left as by-products from the manufacture of leather in tanneries and are usually called skin-splits or scrapings." This material is disintegrated and made into a homogeneous suspension of a pasty nature from which sausage casings are made. The casings are dried at a temperature of 50° C.

The reference Becker discloses the making of sausage skins. The patent states:

"This invention relates to a method and device for working up fibrous material from hide substance, and particularly from substance that has been swelled by a preceding chemical or chemico-physical treatment, the hide substance being obtained chiefly from hides, skins, hide and skin pieces, splits, glue-material, scrapings, and the like.

"It is the object of the invention to expose the fibers within the swelled hide substance by a special mechanical treatment and to arrange the exposed fibers in a certain order for the purpose of bringing about a condition of the hide substance, in which the fibers or bundles of fibers are more or less isolated and the pasty mass produced is particularly suited for being made into plane, threadlike or tubular structures."

The patent to Schulte discloses making surgical sutures or violin strings by disintegrating sinews, skins, etc., and forming a suspension which is extruded through a suitable form to fashion the strings. The drying of the strings must "not be too severe; a moisture content between 30% and 40% is with advantage retained in the band."

In affirming the decision of the examiner the Board of Appeals in its decision, after discussing the references, stated:

"It is apparent that these patents do not specify the exact drying temperature involved in the appealed claims, namely not exceeding 25° C. The examiner, however, refers to the Hulbert patent to disclose the drying temperature. In this patent leather is dried at a temperature varying from 80° to 95° F. (27°–35° C.) and with a moisture content from 35 to 45% humidity. The examiner holds that it would not be inventive to dry the product in the first three patents cited at the temperature shown by Hulbert.

"Applicant states in his brief that at the lower limit specified by Hulbert the patentee would dry at the temperature specified in the claims. He, however, argues that the patentee does not teach drying at this low temperature in order to get a product that has a higher tensile strength than that of prior products. Applicant has filed an affidavit by which he attempts to show that he obtains an improved product when drying is carried out at the low temperature set forth.

"It seems to us that applicant has not made any substantial advance over the prior art so as to merit a patent. It may be that Hulbert does not state the advantage of drying at a low temperature, but if such a temperature be used he would obtain such advantage. We do not believe that any one working in this art should be denied the use of such low temperature drying in view of Hulbert. If this low temperature be employed in the first three patents, applicant's claims would apparently be met. We believe that it would be obvious to any one in the art to dry at this low temperature in these prior patents. The temperature specified in the claims is somewhat above room temperature. Obviously any one should not be barred from applying a small amount of heat in drying the material in the first three patents referred to."

Appellants' brief states: "While Hulbert does mention a temperature and relative humidity for the drying air which he employs for drying leather which would give a wet bulb temperature of less than 25° C., he does not teach the art that the product dried would assume a temperature of less than 25° C. or that such drying leather should not exceed a temperature of 25° C. * * *"

It is true that Hulbert does not teach that the drying leather should not exceed a wet bulb temperature of 25° C., but he does teach that it may be dried at a wet bulb temperature of less than 25° C., and we do not think that the discovery that the wet bulb temperature should not exceed 25° C. (or 27° C. as stated in the application) is inventive. One skilled in the art, following the teachings of Hulbert at the different ranges of temperature named by him, would quickly discover that,

in order to secure good results, he should confine himself to the lower temperatures disclosed by Hulbert.

The claims recite that the wet bulb temperature shall not exceed 25° C. and that the dry bulb temperature is at least 41° C., whereby the temperature of the drying artificial gut does not exceed 25° C. . If appellant's process produces this result as applied to his material, we think that, applying the lower temperature ranges of Hulbert's process to the same material, one would produce substantially the same result.

It is true that Hulbert does not disclose a dry air temperature of 41° C., which is equal to 105.8° F., but he states that with a relative air humidity of 35 to 45 per cent he dries at a temperature of 80° to 95° F., which is equivalent to 27° C. to 35° C., and the wet bulb temperature would be much less than 25° C.

As stated by the examiner, there is nothing in appellants' application showing that the dry bulb temperature of 41° C. is critical. We find in appellants' specification only one reference to dry air temperature in terms of degrees. In an example given it is stated that if the outer temperature is 20° C. and the atmospheric moisture is 60 per cent of relative moisture, if the temperature of the drying gut is not to exceed 25° C., "the dry air must at most only be heated to 53° C." This language clearly conveys the idea that the dry air temperature may be less than 53° C. in the example given, and we find nothing in the application teaching that at least 41° C. dry air temperature must be employed to dry the gut at a wet bulb temperature of 25° C.

Upon this point it is our opinion that the difference between the dry air temperature of the claims, 41° C., equal to 105.8° F., and the dry air temperature disclosed by Hulbert of 80° to 95° F., is only a difference of degree not resulting in a difference of kind in results.

It is appellants' contention that the Hulbert patent relates to a nonanalogous art, but in this we cannot agree. Both Hulbert's patent and appellants' application relate to the drying of animal sinews. Appellants convert a hide into a plastic mass and treat it. Hulbert's patent relates to hides and leather, without conversion of the same into other material.

We think that one skilled in the art, having before him the patent to Samuel or the patent to Becker, and the patent to Hulbert, could, without the exercise of the inventive faculty, apply the lower temperature limits disclosed by Hulbert for the drying of leather to the drying of artificial gut for sausage casings disclosed by Samuel and by Becker. Were this done, it is clear that the claims before us would be substantially met by such combination of references.

For the reasons herein stated, the decision of the Board of Appeals is affirmed.

Affirmed.