**F. A. SMITH MFG. CO., Inc., v. SAMSON–UNITED CORPORATION.**

No. 298.

Circuit Court of Appeals, Second Circuit.

Aug. 7, 1942.

Bean, Brooks, Buckley & Bean, of Buffalo, N. Y., and (Kwis, Hudson & Kent, of Cleveland, Ohio (A. J. Hudson, of Cleveland, Ohio, of counsel), for appellant.

W. B. Morton and H. Stanley Mansfield, both of New York City, for appellee.

Before SWAN, CHASE, and FRANK, Circuit Judges.

CHASE, Circuit Judge.

The appeal is from a decree in the usual suit in equity holding valid and infringed claims 1 to 7 inclusive and 15 and 18 of Patent No. 2,095,223 granted to A. O. Samuels on October 5, 1937 and duly assigned to the plaintiff.

The patent in suit is for a fan of the motor-driven type having flexible blades, made of a suitable material like rubber, which will be efficient for producing air currents and hold their shape when not in operation and yet will be comparatively harmless when being run without a guard because the blades will yield readily to any solid obstruction which they hit and will resume their normal shape and efficiency when the obstruction is withdrawn.

Only one of the other objects of the invention as stated in the specifications need now be noticed and that merely to emphasize the substantial difference between the real issue on this appeal and what was decided when this patent was previously considered by this court upon two former appeals. It is that, "A further object of this invention is to provide the fan blades with novel fastening means and a novel mode of mounting to provide for a quick and efficient attachment of the blades to the rotating member in a normally radial position thereto." It was with that feature as disclosed and claimed that we were primarily concerned both in Samson-United Corp. v. Sears, Roebuck & Co., Inc., 2 Cir., 103 F.2d 312, certiorari denied 307 U.S. 638, 59 S.Ct. 1039, 83 L.Ed. 1519 and in Samson-United Corp. v. Emanuel, 2 Cir., 109 F.2d 922. We held the patent valid in each instance and the device with cupped blades constructed with the accused means of attachment of fan blades to the hub or nose an infringement. This defendant has not used the novel method of fan-blade attachment disclosed in the patent but has foregone any advantage there may be in having detachable blades and constructed its fan with nose and blades integral by molding them of rubber into one piece. The present issues are whether the patent is valid in the light of some additional evidence as to the prior art and the identity of the actual inventor and, if so, whether

there are valid claims broad enough to cover the accused fan.

■ When new evidence is presented, a patent previously held valid may, of course, be found the contrary. Cf. Smith v. Hall, 2 Cir., 83 F.2d 217, affirmed 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049. The several prior art patents which were not considered in our previous opinions which are now relied on will be discussed following a re-statement of the scope of the patent to dissipate any idea that it is limited to the mere method of the attachment of demountable fan blades to the hub or that the avoidance of that feature is a by-pass of the entire patent.

The specifications show, inter alia, that "the blades may be cut, molded, or otherwise constructed or formed into any desired conformation to produce the desired results. For the best results, the blades are preferably relatively wide and sufficiently rigid, that is, stable, to be self-sustaining, and may extend substantially perpendicularly or radially with reference thereto at all times." And also that, "A convenient shape of the blade is with a width relatively wide with reference to its length radial to the hub, and with reference to the width of blades commonly employed on electric fans. I find a ratio of one-to-one, or even a width greater than the radial length, a suitable arrangement as shown in the drawings. However, I do not intend to limit my invention to any particular width of blade and I may employ any structure of blade which will produce the results to which my invention is directed." * * * "In making the fan blades of rubber they may be molded into the proper shape and in molding the weight of the blades is distributed in the body thereof to make them balance when mounted to their hub or motor housing."

As was stated in the Sears, Roebuck case and reiterated in the Emanuel case the mere use of soft rubber was not new in fan blades, and this patent does not have such a broad scope. What Samuels did show, however, was a conformation which was a means of attaining sufficient rigidity in the blades so that they would keep their shape and utility; look like fan blades when the fan was not in operation—an important selling feature—while at the same time the requisite softness was preserved to prevent damage to a solid object coming into contact with the revolving blades or permanent damage to the blades themselves. Included

in this teaching, to be sure, was the specific method of attaching the rubber blades to a metal hub. This feature is a part of claims 8-14, 16 and 17, but it is not the whole of the invention that was otherwise covered by the claims in suit. Included also is the general idea of the use of cupped resilient blades with a considerable width in relation to their length, which factor enables them to be efficient; to return to efficient shape after meeting some obstruction and to retain or resume their shape when in and out of use. It is not without significance that this construction had to wait for this comparatively recent invention though metal power fans of similar shape had long been in wide use before 1937; rubber was a well known and easily obtained resilient material; and attempts to make satisfactory rubber fan blades were neither lacking nor successful enough to be commercially of comparable value.

Three of the patents presented for consideration here which were not mentioned in the previous opinions may be treated together. In Carlson No. 1,370,284, Gilbert No. 2,022,417, both involving metal-bladed fans with blades similar in shape to Samuels but inherently stable, and Read No. 92,884, reissue No. 4,391 showing an improved screw propeller made of hard rubber for a water-meter the problem of curving and cupping the blade in order to preserve both its yielding qualities and its efficient shape in use was not presented. So the fact that the blades were of somewhat the same shape in Carlson and Gilbert cannot be said to have been any part of the prior art of shaping flexible blades for power fans to give them the practical advantages of flexibility and the efficiency of inflexibility.

Ljungstrom No. 1,868,113, showing a hub with loops of fabric attached to form blades, is far from the sphere of Samuels as it embodies precisely one of the elements he sought to avoid; that of a fan with blades so limp that it did not resemble the conventional fan when not in motion. French Patent No. 735,817 showing a fan with blades of rubber, fabric or other soft material is also called to our attention. This apparently did not even consider the problem of the shape of the blades, much less solve it, and without that it is merely a type of fan with non-rigid blades and no forerunner of the Samuels invention. Without repeating what we have before said on the question of validity, we reach

here the same result for the same reasons since we find nothing in the new evidence on that subject which should lead to a different conclusion.

■ The appellant also claims that Samuels was not the first inventor of the fan blade for which he obtained his patent, but that Humphreys was. There is conflict in the testimony as to what occurred at a meeting held on August 21, 1935, when plans for the development of the rubber-bladed fan were first laid. Both Samuels and Humphreys were present at the meeting, and the outcome was that Humphreys was commissioned to build a fan with rubber blades for the Samson-United Corp. He was to do this at the factory of K-W Ignition Co., by whom he was employed at the time and which had business relations with Samson-United in that it supplied them with electric motors. The disagreement related to who suggested what at the meeting. The District Judge, who had the benefit of observing the witnesses, concluded that Humphreys' claim to the invention was not to be believed. The explanation given by Humphreys for his failure to assert his claim to invention before now is that his employer, K-W Ignition Co., wishing to keep on friendly terms with Samson-United in order to get their motor business, had urged him not to object to Samuels' filing of the application for the patent. But this excuse could have existed only until September, 1937, for at that time he left K-W. His continued silence thereafter while Samson-United defended the patent in three suits and proved its commercial value does not comport with normal human conduct. Also, as the lower court pointed out, Humphreys' credibility may be affected by the fact that he is presently employed by the Ohio Rubber Co. which makes the rubber hub and blade assembly for the accused fans. In the premises the trial judge would not have been warranted in finding that he had rebutted the presumption flowing from the grant of the patent to Samuels that the grantee was the first inventor. Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983; Cantrell v. Wallick, 117 U.S. 689, 6 S.Ct. 970, 29 L.Ed. 1017.

■ On the question of infringement there is little which need be said since the defendant's fan is so obviously a copy except as to hub material and the method of blade attachment. The scope of the patent, as above shown, is broad enough to cover the defendant's fan and the claims relied on, not limited to detachably mounted blades, cover it as well. The accused fan is to all intents and purposes a copy of the assembled patented fan. The difference, as previously stated, is that it has the hub and blades molded in one piece of rubber. The shape of the blades gives them all the characteristics of those of the patented fan. They have the same utility and the same general appearance for the same reasons. There is no difference at all in the fans patent-wise. Barber v. Otis Motor Sales Co., 2 Cir., 240 F. 723; Arthur Colton Co. v. McKesson & Robbins, Inc., 2 Cir., 58 F.2d 157. Merely to mold in one piece what the patentee elected to assemble from more than one was but to substitute an obvious equivalent for what the specifications disclosed. Hookless Fastener Co. v. G. E. Prentice Mfg. Co., 2 Cir., 75 F.2d 264.

Decree affirmed.

FRANK, Circuit Judge (dissenting).

I dissent for the following reasons: This case presents several significant features unlike those before this court in the earlier cases holding this patent valid in infringement suits against other parties, i. e., Samson-United Corp. v. Sears-Roebuck & Co., 2 Cir., 1939, 103 F.2d 312, and Samson-United Corp. v. Emanuel, 2 Cir., 1940, 109 F.2d 922. The outstanding differences are these:

(a) Two prior art patents are before us here which were not before us in either of those cases, i. e., Carlson, No. 1,370,284 and Read, No. 4,391. Two others, Gilbert, No. 3,022,417 and French Patent, No. 735,-817 were neither in the printed record in this court in the Sears-Roebuck case, nor discussed in the briefs or opinion here. They were before this court in the Emanuel case; but examination of the briefs there filed shows that the infringer did not even discuss them; and they are not so much as mentioned in our court's opinion in that case.

(b) In neither of these earlier cases was there any evidence—as there is here—that the patentee had actually before him, as patterns, when at work on the alleged invention, the Diehl device (made under Ljungstrom, No. 1,868,113) and the Gilbert device, the patentee actually copying the shape of the blades found in the latter.

(c) Since these earlier decisions, this court has announced a more rigorous standard of inventiveness.

(d) In neither of those earlier cases was there any evidence, as there is here, (1) as to precisely how little the patentee did in arriving at his idea or (2) tending to show that he did not contrive the patented device (i. e., was not himself the inventor if there was an invention).

(e) In the earlier cases, this court, in sustaining validity, did so on the narrow basis of the patentee's use of "slots"; and there are no "slots" in the alleged infringing device here.

1. Some (not all) of these factors are recognized in the majority opinion. In effect, that opinion says that our prior decisions sustaining this patent are of little relevance here; and it sustains the patent's validity and finds infringement on the basis that Samuels invented a fan with a distinctive shape given to the rubber blades. The majority concedes that there was no invention in rubber blades. The pivotal factor in the majority opinion is the *shape* of Samuels' blades. Yet the majority also, to some extent, recognizes—although it does not highlight that fact—that the shape of the blades was copied by Samuels from the Gilbert metal-bladed fan.

The lack of invention involved in Samuels' activities is, I think, illuminated by the following: In the trial of the instant case, as above noted, there was evidence—as there was not in the previous cases—concerning the details of the manner in which Samuels arrived at his so-called invention. In the earlier cases, he had glibly testified that, deciding that metal fan blades were dangerous, he had experimented in methods of making a fan that would remove the hazard found in the metal-blade fan. He then testified to "experiments and studies" which he carried on continuously, starting with paper, cloth, canvas and all types of materials; what he was seeking, he said, was a fan that would be safe and at the same time would "give the air delivery for which the fan was intended." He wanted, he said, safety, air delivery and a material that would spring back and not get out of shape. He was then subjected to but the briefest cross examination which brought out no further facts concerning the method of which he "discovered" his device. The picture was that of a highly ingenious mind, busily engaged in experimentation which yielded a marked advance in the art.

But in the trial in the case at bar, Samuels told a very different story, one which discloses a very different picture. In this trial, there was introduced (by the alleged infringer) for the first time the testimony of Humphreys who, admittedly, had done the actual work of making the model on which the patent was based. Faced with Humphreys' testimony, Samuels here, for the first time, told the following story:

He had (he now testified) carefully studied what was known as the Diehl fan, made under Ljungstrom Patent No. 1,868,-113, and then marketed by Sears-Roebuck. In that patent, the specifications called for a fan with blades of "non-elastic flexible material." Samuels was not satisfied with the Diehl fan because, he testified, the blades "were too floppy and in my opinion were not entirely satisfactory because of the appearance which they took, because of their floppy condition and also because of the fact that they did not deliver enough air in my opinion." His chief concern was with the sales resistance to a fan like the Diehl device because, when not in operation, it did not look like a fan. He had, he said, carefully studied the metal fan, then on the market, made pursuant to the Gilbert patent. In conferring with Humphreys—who, according to Samuels, carried out Samuels' instructions in making what became the patented device—Samuels showed Humphreys the Gilbert fan (which had "cat's ears" blades like the patented device in suit) and said that *"the shape, which from all indications we are going to be using in our rubber bladed fan, would be very much along the lines of the shape of the blades of the Gilbert fan."* He told Humphreys that the blades were to be made of a flexible material and "had to be made in a way so as *to offset the consumer's resistance to a fan* that would have blades that would tear or would be apt to be sufficiently damaged so as to make the entire fan unusable; and I discussed at length the necessity of our design being of a means that would permit removal of the blades for replacement and, as I recollect at that time we had sketches showing the blades of approximately a similar shape to that of A. C. Gilbert with a group of rivets attached on the inner area of the blades, and we discussed my plan whereby we would make the nose-piece with a slot in it and the blades could be assembled on the nose-piece by threading them through the slots and the blade would be prevented from pulling out by the rivets that protruded on the inner area of the blades." And he also testified that he

showed Humphreys a rubber blade which followed the pattern of the blade shown in the Gilbert fan.

The appellee's brief in the instant case concedes, indeed, that, when Humphreys conferred with Samuels, the latter "had on his desk the Diehl fan with the ribbon blades * * * and the Gilbert fan nose-piece removed from the fan and with one blade detached"; that "Samuels said of the Diehl fan with the flexible ribbon blades that, 'This is the thing we have to meet competition on' "; and that Samuels told Humphreys *"he wanted him to take the Gilbert fan and reproduce the blades in rubber* and fasten them to the hub by appropriate screws, rivets or the like." The same brief also states that Samuels "in instructing Humphreys how to build the first model fan to incorporate his invention, told him to *copy the metal blades of Gilbert in rubber* * * * Samuels' idea from the time of his first study of the Diehl ribbon blade fan was to make a fan with soft, flexible blades, which 'would look like a fan' and have an air delivery comparable to the metal blade."

A witness, called by the appellee, testified that, when he visited Samuels, "The ribbon fan * * * was on the desk and he asked my opinion as to whether it would be possible to put rubber blades on the fan, and he made the statement that the ribbon fan did not look like a fan, would not be recognized by an ordinary person as a fan, and he believed that a fan with rubber blades could be built to look like a fan so a person would recognize it as a fan, and that it would have *all the advantages of a ribbon fan* and perhaps even be better." In one of his discussions with Samuels, there was talk of "having a device that, when it was standing still, it would look like a fan and a comparison was made of the curved blades like cats' ears, so they would stand up, of flexible material as a cat's ear is of a curved shape, to hold its shape, and still be relatively soft." In this connection there were repeated discussions of the Diehl and Gilbert fans.

It is obvious from the new testimony that, at most, Samuels—inspired by the safety feature of the Diehl fan which used non-metal flexible blades—merely copied the Gilbert fan, substituting, for the metal in the blades of that fan, flexible material somewhat stiffer than was used in the Diehl "ribbon" fan. Apparently recognizing the danger of this new testimony to Samuels' claim of inventiveness, the appellee in its brief, says that the actual facts as to the methods employed by Samuels in arriving at the patented device are of no importance. Why? Because the appellee (recognizing a well established rule[1]) says, in its brief, Samuels "is presumed to have knowledge of all the prior art."

Let us take appellee at its word. We must then assume that Samuels, in contriving his device, actually had before him and studied carefully every one of the prior art patents. Let us note then what he did that can be said to entitle him to claim invention:

(a) The designing of the cat's-ear shaped fan, with blades exactly like those in the patented device—so as to give "an air delivery" of the desired kind—was not new. Admittedly all that was directly copied from Gilbert; Samuels' fan is merely Gilbert's with the blades made of rubber. The majority opinion makes much of the fact that the shape of the blades was of great importance in making them "efficient" or, to use Samuels' words, to "give the air delivery for which the fan was intended." That efficiency was Gilbert's, not Samuels', contribution.

(b) The use of rubber or other flexible material in revolving blades was not new. It had been shown in the French Patent, No. 735,817; in Turner, No. 1,392,029; and in Ljungstrom, No. 1,868,113.

(c) In those three patents the expressed purpose was to *afford safety* to intruding hands.

(d) In the Read Patent, No. 4,391, the expressed purpose, stated by Read, was *to enable the blades to "resume their original shape"* if "sprung out of form by an extraordinary force."

There was then no invention in the shape of the blades. (Not even the design was new; for Gosling, No. 86,076, a design patent, is almost identical in appearance.) There was no invention in the use of rubber or other flexible materials,[2] either (1)

[1] Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 494, 20 S.Ct. 708, 44 L.Ed. 856; Buchanan v. Wyeth H. & M. Co., 8 Cir., 47 F.2d 704, 710; Zephyr American Corporation v. Bates Mfg. Co., 3 Cir., 128 F.2d 380, 385.

[2] Cf. Rubber-Tip Pencil Co. v. Howard, 20 Wall. 498, 507, 22 L.Ed. 410;

to afford safety or (2) to prevent breaking or bending of the blades.

By way of partial answer to such contentions, the majority opinion purports, in effect, to find two separate and distinct prior arts, i. e., (a) that relating to the shape of fan blades where made of metal and (b) that relating to the use of rubber (or other flexible material) in making fan blades. The inventive genius which the majority discovers in Samuels' contrivance is the importation of the shape idea from the first of those two alleged fields into the second. I cannot agree that that constitutes invention.

In the first place, all these patents and the patent in suit are, I think, in the same field, i. e., that of fan blades, with the exception of Read's patent. And even if the fields could be said to be different, they are analogous.[3] That is true even of Read.

The doctrine by which there is excluded from the pertinent prior art, devices in other non-analogous fields stems principally from Potts & Co. v. Creager, 155 U.S. 597, 607, 608, 15 S.Ct. 194, 198, 39 L.Ed. 275, where it was said: "Indeed, it often requires as acute a perception of the relations between cause and effect, and as much of the peculiar intuitive genius which is a characteristic of great inventors, to grasp the idea that a device used in one art may be made available in another, as would be necessary to create the device de novo"; the court said that there may be involved "an exercise of the inventive faculty," if the relations between the field in which the new is used and the old field in which it had previously been used "be remote." However, far less of the "intuitive genius * * * characteristic of great inventors," is needed today to see such relations, because today group research has so markedly developed that old practices in one field are entirely likely to be known to those who, for the time being, are working in another field, with the consequence that such cross-fertilization is now far more

routine than when Potts v. Creager was decided.[4]

In Toledo Pressed Steel Co. v. Standard Parts, 307 U.S. 350, 355, 356, 59 S.Ct. 897, 899, 83 L.Ed. 1334, the court said: "The torch body was old in the art to which it belonged. The cap, as part of devices *used in other fields,* was old and useful to prevent extinguishment of flames by wind or rain and to permit flames to extend through holes to the open air. The problem patentees set for themselves was to prevent extinguishment while preserving usefulness of the flames as warning signals. They solved it by merely bringing together the torch and cap. As before, the torch continued to produce a luminescent, undulating flame, and the cap continued to let in air for combustion, to protect the flame from wind and rain and to allow it to emerge as a warning signal. * * * The patented device results from mere aggregation of two old devices, and not from invention or discovery. * * * On the records before us, it is impossible to hold that production of the patented device required more than mechanical skill and originality attributable to those familiar with the art of protecting flames of kerosene and other burners."[5] In Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 40, 86 L. Ed. 58, the court held that there was no invention involved in incorporating in a "wireless" cigar-lighter a thermostatic control, theretofore used in electric heaters, toasters or irons. "To incorporate such a thermostatic control in a so-called 'wireless' or 'cordless' lighter was not to make an 'invention' or 'discovery' within the meaning of the patent laws. As we have shown, both the thermostatically controlled heating unit and the lighter with a removable plug bearing the heating unit were disclosed by the prior art. More must be done than to utilize the skill of the art in bringing old tools into new combinations. * * * He merely incorporated the well-known thermostat into the old 'wireless'

---

Oliver-Sherwood Co. v. Patterson-Ballagh Corp., 9 Cir., 95 F.2d 70, 80.

[3] See, e.g., Powers-Kennedy Contracting Co. v. Concrete Mixing & Conveying Co., 282 U.S. 175, 51 S.Ct. 95, 75 L. Ed. 278; Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 483–486, 55 S.Ct. 455, 79 L.Ed. 1005; Utah Radio Products Co. v. General Motors Corp., 2 Cir., 106 F.2d 5, 7, 8; In re Becker, Cust. & Pat.App., 118 F.2d

563, 566; Toledo Pressed Steel Co. v. Standard Parts, infra; Cuno Corp. v. Automatic Devices Corp., infra; Phillips v. Detroit, 111 U.S. 604, 607, 608, 4 S. Ct. 580, 28 L.Ed. 532; Concrete Appliances Co. v. Gomery, 269 U.S. 177, 46 S.Ct. 42, 70 L.Ed. 222.

[4] Cf. Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632.

[5] Emphasis added.

[or 'cordless'] lighter to produce a more efficient, useful and convenient article."

Moreover, the feature of a flexible blade appears also in the propeller blade patented by Nilson (No. 1,308,527) which was specifically referred to in a letter, dated April 24, 1935, to Samuels from his patent attorney. Significantly enough, he said in that letter: "In view of these patents [Nilson and another], I doubt whether very much protection can be had on the Fan Blade for use in ordinary fans. The Patent Office would probably hold that *making them more flexible would simply be a change in degree that would not amount to invention.*"

Most important is this fact: Since our two earlier decisions sustaining this patent against other defendants, we have avowedly shifted our test of invention. Compare the test employed in E. I. Dupont De Nemours & Co. v. Glidden Co., 2 Cir., 67 F.2d 392, 394[6] with Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632, 636, decided a few weeks ago. The shift, as expressly stated by Judge Learned Hand in the Picard case, resulted from a stiffened attitude of the Supreme Court respecting inventiveness, which began at least ten years ago.[7] In that case (per Judge Learned Hand) we said that the "safest test" of inventions "is to try to reconstruct the history of the art before and after their appearance and judge from that how far they demanded exceptional talents." We

recognized that that test is difficult of application because it is not easy to "isolate the contributing factors." We concluded with a negative test of invention: Nothing, we said, is an invention, which is the product of "the slow but inevitable progress * * * through trial and error" and of "the exercise of persistent and intelligent search for improvement."[8] I doubt whether Samuels' work could be characterized as even "intelligent search for improvement," whether it meets even the old standard which this court applied in the Dupont case and which it recently abandoned in Picard. I can see no basis for holding that he meets the new test we described, in the last named case, as recently as May 28, 1942. If Samuels is an inventor, then surely Picard was, and so was Mead in Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58. Yet Picard's and Mead's patents were held invalid. Samuels' sauce ought not to be different from Mead's and Picard's.

The Picard standard markedly diminishes the significance of the commercial success of Samuels' device. A mere product of progress through trial and error is, we have said, not invention; yet such a product may suddenly fill a public need or a "long-felt want" and result in large sales. And such success is, in any event, a poor test of invention, for it is well settled that it is only when invention is in considerable doubt that that factor has any significance.[9]

---

[6] There this court said: "True, all that Flaherty did was to carry out what was already known, and by trial and error fix the limit which should be observed. If genius is demanded, surely he was no inventor; rather he was one of those who, taking the knowledge at hand, worked out its *implications in the laboratory.* There are indeed expressions in the books which, taken literally, would exclude such work from the protection of the patent laws; there are others which would not. But we deprecate such a priori rules for determining invention."

[7] See my concurring opinion in the Picard case as to the date when this "stiffening" began and as to the *probable reason for it.*

[8] As I suggested in concurring in the Picard case, this new test reduces the element of judicial subjectivity in deciding what is an invention. As to that subjective element, see Kirsch Mfg. Co. v. Gould Mersereau Co., 2 Cir., 6 F.2d 793, 794, where it was said that the question is whether there is "a new

display of ingenuity beyond the compass of the routineer * * *."

In applying the test of the Picard case, judges should not be too much impressed by the fact that the patented device seems new or profound to themselves or other laymen or to the public generally. Cf. Radtke Patents Corp. v. Coe, 74 App.D.C. 251, 122 F.2d 937, 946, certiorari denied 314 U.S. 695, 62 S.Ct. 411, 86 L.Ed. ——; Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 437, 22 S.Ct. 698, 46 L.Ed. 968.

[9] Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 474, 55 S.Ct. 449, 79 L.Ed. 997; De Forest Radio Co. v. General Electric Co., 283 U.S. 664, 685, 51 S.Ct. 563, 75 L.Ed. 1339; Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486, 495, 496, 23 L.Ed. 952; Firestone Tire & Rubber Co. v. United States Rubber Co., 6 Cir., 79 F.2d 948, 954, cited with approval in Toledo Pressed Steel Co. v. Standard Parts, 307 U.S. 350, 357, 59 S.Ct. 897, 83 L.Ed. 1334; Textile Machine Works

"It seems," it was said, in a case where that factor was held to have no importance, "that no one did discover this exact use for the locknut in combination with other elements up to Buchanan's time, but someone had to think of it first, even if it constituted merely mechanical skill. The fact that Buchanan was the first so to think bears on the question of invention, but is not at all decisive."[10] Such an idea is often lurking in the prior art, ready to pop out; its earlier retardation is often ascribable to such facts—not easy to prove—as (to give but a few examples) that the public was not previously ready for it, or that the price of some of the ingredients was previously too great, or that manufacturers in the field to which it became a successful adjunct were too busy with other gadgets.[11] We should not forget that the effect of holding valid a patent on a mere trial-and-error product, such as this, is to create a monopoly which, for seventeen years, will shut out others who, by similar trial and error, may well have hit on the same device a month or a year later.[12]

In concurring in the Picard case, I suggested that in issuing a patent—and perhaps in passing on its validity—an important consideration might well be whether a very considerable investment is necessary to bring the device to the practical commercial stage. No such consideration is present here.

2. Not only does the prior art show no invention, but it also serves to show, that if there is validity, there is no infringement: Appellant's device is a unitary rubber structure. Such a unitary device in metal was disclosed in Carlson, No. 1,370,-284; the blades there shown are of the same cat's-ear shape as in Samuels' patent and as in appellant's fan. And Read, No. 4,391 showed a unitary rubber structure.

3. It would be sufficient for appellant to show (a) invalidity or (b) non-infringement. But there is evidence which, I think, also shows that, if there was an invention and if appellant is using it, it is in the public domain because Samuels was not the inventor and the inventor, Humphreys, has not patented it.

Much of the testimony on this issue was by deposition. Accordingly, we are in substantially as good a position as the trial judge to pass on credibility of witnesses, etc. Consequently, the findings, although the evidence is in conflict, are not entitled to much weight here.[13]

I have already pointed out how easily Samuels changed his testimony to suit the occasion. Both as to the problem to be met and as to his methods in meeting it, he shifted so substantially from one trial to another that his testimony is to be viewed most sceptically. " 'Afterthought' is a word commonly used by judges to designate testimony that labors under grave suspicion because, if it were true, the party's neglect to produce it at an earlier stage * * * is a singular oversight. Thus it often happens on new trial * * * that a party changes his testimony to meet the varying features of the case. * * * Judges usually express a strong feeling that no dependence can be placed upon the testimony which thus has been changed. * * * For similar reasons, dis-

---

v. Louis Hirsch Co., 302 U.S. 490, 498, 499, 58 S.Ct. 291, 82 L.Ed. 382; Altoona Publix Theatres v. American Tri-Ergon Corp., supra.

[10] Buchanan v. Wyeth H. & M. Co., 8 Cir., 47 F.2d 704, 712; Mast, Foos & Co. v. Stover Mfg. Co., supra; cf. Zephyr American Corporation v. Bates Mfg. Co., 3 Cir., 128 F.2d 380, 385; Triumph Explosives v. Kilgore Mfg. Co., 4 Cir., 128 F.2d 444, 447, 449.

[11] Cf. Textile Machine Works v. Louis Hirsch Co., 302 U.S. 490, 499, 58 S.Ct. 291, 82 L.Ed. 382; Toledo Pressed Steel Co. v. Standard Parts, 307 U.S. 350, 357, 59 S.Ct. 897, 83 L.Ed. 1334; Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 474, 55 S.Ct. 449, 79 L.Ed. 997; McClain v. Ortmayer, 141 U.S. 419, 12 S.Ct. 76, 35 L.Ed. 800;

Buchanan v. Wyeth H. & M. Co., 8 Cir., 47 F.2d 704, 707.

[12] See the 1935 Report of the Committee of the Advisory Board, quoted in the concurring opinion in the Picard case, supra.

[13] State Farm M. Auto Ins. Co. v. Bonacci, 8 Cir., 111 F.2d 412, 415; Fleming v. Palmer, 1 Cir., 123 F.2d 749, 751; Equitable Life Assurance Association v. Irelan, 9 Cir., 123 F.2d 462, 464; United States v. Anderson Co., 7 Cir., 119 F.2d 343, 346; Wigginton v. Order of U. C. Travellers, 7 Cir., 126 F.2d 659, 661; United States v. Mammoth Oil Co., 8 Cir., 14 F.2d 705, 716-718; Levy v. Weinberg & Holman, Inc., 2 Cir., 20 F. 2d 565, 567; Kuhn v. Princess Lida, 3 Cir., 119 F.2d 704, 705, 706; cf. Midwood Associates v. Commissioner, 2 Cir., 115 F.2d 871, 872.

trust attaches to new evidence on a motion for new trial, or on a bill of review * * * and generally to evidence tardily introduced after a party has had an opportunity to change it in conformity with the altered circumstances of his case. * * * A witness who has had ample opportunity to narrate his connection with a transaction, and apparently relates the same fully, and thereafter in other litigation gives a different narrative in relation thereto, or one from which an entirely different inference may be drawn, is not usually to be depended on for accuracy of statement. The testimony of such a witness should be carefully scrutinized before it is accepted as true. Even where it is uncontradicted it should not be accepted if there are reasonable grounds for believing that it is unreliable or mistaken. Certainly the testimony of one who concededly withheld material and important testimony upon a former trial ought to be convincingly supported by other satisfactory evidence, before such testimony, first offered at a later trial involving the same issue, is accepted." Moore, Facts, §§ 1059, 1132, cf. §§ 757, 1079.

Humphreys' testimony was corroborated in important details by another witness, Hansen. Furthermore, it should be remembered that Humphreys had worked for two companies which were engaged in the manufacture of fans, and had experimented extensively with fan blades. His story that Samuels had turned the blade problem over to him with but a few vague suggestions, is inherently more plausible than Samuels' testimony, even if the latter were not impeached by Samuels' willingness to suit his testimony to the occasions.

It is suggested in the majority opinion that there is a presumption, flowing from the grant of the patent to Samuels that he was the first inventor. The cases cited —Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983, and Cantrell v. Wallick, 117 U.S. 689, 6 S.Ct. 970, 29 L.Ed. 1017—are, as I understand them, to the effect merely that the burden of proving want of novelty—by showing prior publication, prior use, and the like—is on the defendant because presumably the Patent Office, at least to some extent, has explored those issues. But here the issue is as to a matter concerning which the Patent Office could obviously have known nothing, i. e., assuming there was an invention, whether Humphreys, working for Samuels, was the real inventor from whom Samuels "borrowed" the idea. Since, on that subject, the Patent Office, because of the non-public character of its hearings, was inevitably in total ignorance, no presumption with respect thereto can flow from its grant of a patent to Samuels.[14]

The majority opinion stresses the fact that Humphreys not only did not apply for a patent but maintained silence while appellee here asserted the patent in the earlier suits and there proved its commercial value; such "continued silence," says the majority opinion, "does not comport with normal human conduct." That consideration would be important were it not for the fact that Humphreys testified that he never thought there was any invention involved in the device which he says he contrived and which Samuels patented. Humphreys' failure to apply for a patent thus comports entirely with normal human conduct. I can see no significance in the fact that he remained silent while appellee brought the earlier suits on the patent, since there is no proof that he was aware of those suits. Moreover, since he did not believe that there was any invention, his silence would not have been strange even if he had known of those suits. He did not in the case at bar appear as a volunteer, but was called as a witness. And in such circumstances, there is no room for asserting an estoppel against Humphreys. That is especially true as he is not a party to the suit; more important, the public interest involved in the elimination of a spurious patent should not, in any event, rest upon an estoppel.

As previously observed, none of the evidence as to Humphreys was in the records of the cases covering this patent which we heretofore decided. It is to be noted that the Supreme Court, having twice held that Smith's Patent No. 1,262,860 was valid (Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721; Waxham v. Smith, 294 U.S. 20, 55 S.Ct. 277, 79 L.Ed. 733) held, on the basis of new evidence, in a third case, that it was invalid. See Smith v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049.

---

14 Cf. Rosenberg v. Groov-Pin Corp., 2 Cir., 81 F.2d 46, 47, 48.