### DE MAYO COALING CO. v. MICHENER STOWAGE CO.

(Circuit Court of Appeals, Second Circuit. February 15, 1916.)

No. 145.

1. PATENTS ⟨⟨⟩⟩35—EVIDENCE OF INVENTION—COMMERCIAL SUCCESS.

    Commercial success of a patented article is not persuasive evidence of invention as to a claim which covers only a part of the patented device, and in the absence of evidence that such part is what secured general acceptance or even contributed to such success.

    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 39; Dec. Dig. ⟨⟨⟩⟩35.]

2. PATENTS ⟨⟨⟩⟩328—VALIDITY AND INFRINGEMENT—APPARATUS FOR COALING SHIPS.

    The De Mayo patent, No. 797,364, for an apparatus for coaling ships, claim 7, the special feature of which consists of guy devices for maintaining the relative positions of the ship and barge while coaling, if conceded invention, held not infringed.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the De Mayo Coaling Company against the Michener Stowage Company. Decree for complainant, and defendant appeals. Reversed.

For opinion below, see 227 Fed. 895.

This cause comes here upon appeal from a decree sustaining the validity of claim 7 of United States patent 797,364, granted August 15, 1905, to Louis A. De Mayo, for improvements in apparatus for coaling vessels, and holding that defendant has infringed said claim. The opinion of Judge Augustus N. Hand will be found in (D. C.) 227 Fed. 895.

Charles S. Champion and Hillary C. Messimer, both of New York City, for appellant.

George B. Holbert, of New York City (Nathan Cohen, of New York City, of counsel), for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge. [1] The District Judge evidently was largely influenced by the circumstance that patentee's apparatus was generally accepted and has had a great commercial success. Such a circumstance is frequently persuasive evidence of patentable novelty. In this concrete case, however, the weight of such evidence is much reduced because the single claim in controversy does not cover the whole of patentee's device, but only a part of it, and it cannot be ascertained from the evidence that that particular part is what secured general acceptance. The case is very like the one we had before us in Doig v. Morgan Machine Company, 122 Fed. 460, 59 C. C. A. 616. In that case claims 5 and 6 were concerned with the adjustment of certain railways. We said:

"If it be conceded * * * that all prior box-nailing machines were failures; that the machine of the patent was the first practical and commercially successful one; that it was accepted by the art, and has since monopolized the field—nevertheless such evidence is not helpful to a solution of the question presented on these two claims. There is nothing to show that this minor improvement in one part of the machine contributed at all to any such far-reaching results. Speaking of the prior state of the art concerning the adjustment of the way-plates, complainant's expert is careful to 'emphasize the fact that this feeder way-plate construction is combined with other elements insuring the proper delivery of the nails thereto, and the proper cutting out or cutting off of the nails into the chutes of the nail boxes. In other words, a nail-pan must be provided which will bring the nails in series to the way-plates of the feeder, suspended by their heads in proper position to be delivered to the nailways of the feeder, for, if the nailways of the feeder be not continuously and properly supplied with nails in proper position to be conducted thereto, the machine will not operate properly. In other words, we are dealing here with an entire organism, to wit, a feeding device for inevitably bringing the nails in proper supply to the chutes, so that the feeding mechanism and the nailing mechanism will operate in harmony.' These two claims, however, do not include the nail supply box, nor the devices for securing passage from that box to the nailways, nor the devices for cutting them out at the end of the nailways and delivering them to the chutes, nor the nail chutes, nor the nailing mechanism. Of the 620 lines of the specification, barely 25 deal with the construction and operation of the nailways; and for aught that the record discloses the meritorious features of complainant's box-nailing machine may lie wholly within the other parts of the completed structure."

231 F.—47

[2] The De Mayo patent sets forth one prime and several minor objects of invention.

1. The prime one is the means for distributing the coal (when it has been lifted) into the various bunker hatches.

2. Another object is constructing the elevator proper, so that it will not spill coal, but deliver all raised in the buckets. This is effected partly by the form and arrangement of the buckets—partly by a shield on the side of the elevator nearest to the ship.

3. Another object is such arrangement of the delivery chute which leads to the coaling port that it may be readily adjusted to suit the lowering of the coal in the barge.

4. Another object is to provide means for sustaining the elevator proper "flexibly in position alongside of the ship, so that any movement of the barge from which the coal is taken will not destroy or rack any of the parts of the apparatus."

As might be supposed, the record indicates that it was old to suspend the elevator from a davit, or boom, or what not on the ship by a tackle, and, as the coal level sank, to pay out on the tackle, so as to keep the bottom of the elevator on the coal. The improvements of the patent last referred to are the "flexible arrangements" for preventing racking of parts.

The testimony shows that the whole apparatus is a useful one, an improvement on the old art, greatly facilitating the process of coaling a large ship with numerous bunkers, without loss, wastage, or dust. When this testimony is studied, however, it is apparent that the distributor from the coal port to the several bunkers is a very important feature of the invention; it must be a great time-saver. So is the feature that by shape and arrangement of buckets, apron, and long shield any overflow will drop back into the barge and not be wasted. So, too, the "self-contained motor"; i. e., motor located on the frame itself to elevate the buckets is considered desirable. Such self-contained motors were old.

Incidentally it may be noted that the distributor on the ship is an element of claims 1, 2, 4, 5, 6, 11, and 12. The shield is an element of claims 9 and 10. The details of buckets and apron are elements of claim 13. The location of the motor for raising the buckets on the frame is an element of claims 3, 7, 8, 9, 10, and possibly 2 and 11.

Such a combination of different subimprovements constituting a single structure may have a great commercial success, and yet such success may not be persuasive evidence that some one of the subimprovements discloses patentable invention. The single claim relied on here is No. 7, which reads:

"7. In an apparatus for coaling ships, the combination of a frame and elevating means thereon, means for driving the elevating means, the driving means being mounted on the frame, means mounted on the ship and connected with the upper part of the frame to suspend the same from the ship, and guy devices at each side of the frame said devices being in connection with the frame and with the ship."

A portion of Fig. 1 and Fig. 1a will sufficiently illustrate the devices which are features in claim 7:

It is manifest that an elevator suspended by a tackle from a davit would be likely to sway; even if its lower end rested on the coal or grain to be elevated. A perfectly obvious way of securing its lower end would be by guys, or tackles such as are shown at *12, 12* in Fig. 1a. Such guys form no part of claim 7. But, even if the lower end were secured by guys, there would be swaying of the upper end, induced partly by the operation of the buckets, partly by the motion of the water on which both barge and vessel rest. Such motion might be lengthwise of the vessel; it might also be to and from the vessel; the upper end might even sway so far inward as to rest against the side of the vessel, which would interfere with the overturn of the buckets and delivery of the coal. Equally obvious would be the devising of means, more or less efficient, to remedy the difficulty. Surely any handy sailor man would know that the upper end might be kept off from the side of the ship by the use of some rigid, unyielding device, which would act as a boom does; also that a lengthwise sway could be checked by guys or tackles near the top and leading fore and aft to the side of the ship.

The specific method of booming and guying which De Mayo adopted is thus described in the patent:

"Attached to each side of the frame on the corners adjacent to the ship are longitudinally extending rails *14* on which fit loosely sleeves, *15*. To these sleeves are pivoted guy rods *16*. Said rods have hooks *17* at their opposite ends, and these hooks are adapted to be engaged with the rail or other convenient part of the ship at each side of the elevator proper in the manner illustrated in Figs. 1 and 1a."

In this structure the rigid guy rods *16* act as a boom to hold the upper end of the elevator off, so that it will not impinge on the side of the ship, but they are so arranged as to secure a give and take

action under pressure, so as to avoid racking of parts. As they are hooked to the ship's rail fore and aft of the elevator they also act as guys to hold against lengthwise swing. The device seems to be a simple one, and it is not shown to disclose patentable invention by testimony as to the 'great commercial success of the whole structure which makes up the De Mayo elevator. Certainly the increased dispatch with which the coaling of ships is effected—a matter made most of in the testimony—is accomplished by the ingeniously devised distributor (36, 37, 38, 39) which promptly and automatically conveys the coal received at the coaling port to the several bunker hatches. This case, as was said before, closely resembles the Doig Case in that respect; out of upwards of 300 lines in the specification only 16 are devoted to these "guy arms"; out of 13 claims they are made an element in 3 only.

Nevertheless for the purposes of this appeal this specific device may be considered patentable. The two following figures disclose defendant's method of suspending its elevator and counteracting the tendency of its upper end to sway:

The elevator is suspended by a tackle $C$ and two guys $CC$; further guys against swaying lengthwise of the ship are shown at $EE$. $B$ is a rigid projection or knuckle from the inner side of the frame, which acts as a boom and effectively prevents the upper end of the elevator from itself impinging on the side of the ship. Movements of the barge caused by disturbance of the water may cause this upper end to swing off from the ship, but as it comes back the knuckle alone will strike the ship's side, quite possibly sometimes with a hard rap which might be likely to rack the parts, a result avoided by De Mayo's guy arms, with their give and take action. The two sets of guy ropes $C$ $E$ check swing lengthwise of the ship; the suspending tackle will, of course, prevent the upper end from tilting over too far, as would De Mayo's suspending tackle $11$. But this is just the simple set of devices, which as was pointed out above, would naturally occur to any one accustomed to handling weights by the use of tackles. It would be, not a reasonable but an unreasonable application of the doctrine of equivalents which would stretch the claim covering the patentee's specific structure to embrace the cruder use of well known devices which would be perfectly obvious to any one seeking to secure the upper end of a suspended elevator from swaying.

The decree is reversed, with costs.