**SCHREYER et al. v. CASCO PRODUCTS CORP. et al.**

No. 2673.

United States District Court
D. Connecticut.

March 9, 1951.

As Amended April 5, 1951.

See also, D.C., 89 F.Supp. 177.

162

David S. Day, Charles S. Brody and Arthur C. Williams, all of Bridgeport, Conn., Morris Hirsch, New York City, Thomas E. Scofield, Kansas City, Mo., for plaintiffs.

David Goldstein, Bernard Glazer, of Bridgeport, Conn. and Stephen H. Philbin, New York City, for defendants.

SMITH, District Judge.

This is a suit for the alleged infringement of U. S. Patent No. 2,475,572 on an electric steam iron brought by Edward P. Schreyer, the patentee, and his exclusive licensee, Rival Manufacturing Company. The plaintiffs seek additional redress for claimed unwarranted use by defendants of certain information relating to the manufacture of the patented device disclosed in confidence during the course of negotiations looking toward the grant of a license under the patent to defendants. These negotiations were terminated without the formation of a license contract. Insofar as possible the two phases of the litigation, the patent issue and the unfair competition issue, were separately dealt with on trial and we shall so deal with them here.

## I. The Patent Issue.

Schreyer's invention on which a patent was issued on July 5, 1949 after more than seventeen months of proceedings in the Patent Office is on a new type of electric steam iron. The patent, as issued, sets forth twenty-five claims which describe in detail and with the familiar variation in phraseology the asserted novel features of the invention. Essentially the iron, which, in appearance, is not unlike the ordinary electric iron, consists of a sole plate (the pressing surface) on which is mounted a boiler formed of sheet metal which may be filled with water. An electric element, embedded in the sole plate, heats the water to the boiling point and also heats the sole plate to temperatures in excess of the boiling point. The iron is so constructed that it can be used for either conventional dry ironing or for steam ironing. In the top of the boiler is a large depressed hole, funnel-like in shape, by means of which water is put into the iron. Substantially the entire top of the boiler is covered with a hinged metal shield to the upper side of which the iron handle is attached. Depending from the under surface of said shield is a closure device, which fits into the funnel-shaped filler hole. The hinged shield is secured in position by a suitable latch located beneath the handle. To fill the iron, said latch is disengaged and the shield plate is swung upward and rearward—the depending closure device, attached to the shield, is thereby removed from the filler hole. The closure device is a silicone button attached to the shield plate in a floating manner and yieldingly pressed downward by an interposed coil spring. It serves the dual function of a means to seal the water in the boiler and a safety valve to permit the escape of steam in the event that excess pressure should be built up within the boiler.

In operation the steam accumulates in the steam dome in the upper part of the boiler and is forced from the steam dome downward through a small tube to a cavity between the floor of the boiler and the sole plate. Orifices through the sole plate provide a means of escape for the steam and a means of dispersing it on the fabric being ironed.

The claimed innovation in the steam iron art is the combination of these elements: the hinged shield plate bearing the handle, the depending safety valve-closure, the large and easily accessible filler opening, and the special latch securing the shield in its closed position. Modifications and variations of these various elements in combination form the basis of each one of the claims allegedly infringed (1, 2, 3, 4, 6, 7, 8, 11, 12, 14 & 18) with the exception of Claim No. 18 which deals with the interrelation between the floor plate of the boiler and the sole plate. No one of the elements in the Schreyer patent, taken separately, appears to be new. The hinged handle long had been known to the iron art as evidenced by the Goodwin patent (issued in 1867, No. 75,150), Gray (1868, No. 79,067) and Waterman (1889, No. 406,608). The latch device used by Schreyer was similar to, but an improvement on, that used in Wonderlich (1906,

No. 829,615). The combined filling-aperture closure and safety valve had been a feature of Theilgaard (1942, No. 2,279,215) and the Challenger and Press Master irons introduced as exhibits at the trial. If the Schreyer invention is patentable at all, it is because it combines the old elements, known to the art, in an ingenious fashion to achieve a new result.

The chief problem in the steam iron industry prior to the Schreyer innovation was that of rendering the opening and closure of the boiler filling-aperture speedy and convenient and of eliminating the need for handling hot parts. It had been found that the conventional screw-plug type closure of the prior art was highly unsatisfactory because the plug had a tendency to corrode at high temperature and stick in the aperture. It was often impossible to dislodge the plug even with resort to tools and frequently the end of the plug was broken off in attempts to loosen it. It was usual for the dissatisfied customer to return such irons to the local dealer; they could be repaired only by drilling out the plug stuck in the aperture and re-tapping it. The iron of the Theilgaard patent and the Challenger and Press Master models, referred to above, attempted to solve the screw-plug problem by resort to a closure positioned by spring pressure. The attempted solution proved unsatisfactory because the seal was not sufficiently tight to prevent leakage in all positions of the iron, and because the safety-valve-feature of the spring-type plugs permitted steam to blow off in the event of excess internal pressure in such a way that it would be likely to scald the hand of the operator. The Schreyer device appears effectively to have solved this "bugaboo" of the industry.

█ The presumption of validity of a patent acquires added strength, where, as in the case at bar, certain prior patents relied on by defendants to show anticipation of the discovery in question have been cited against the application in the course of proceedings in the Patent Office. Stevens v. Carl Schmid, Inc., 2 Cir., 1934, 73 F.2d 54. Not all of the patents on which defendants have relied were cited against the application in the Patent Office but among those which were cited are Goodwin, incorporating the idea of a hinged handle, and Theilgaard which has the combination closure and safety valve. These two are among the most pertinent prior discoveries, each of them proving the want of novelty in essential individual elements of the Schreyer combination. None of those patents cited for the first time by the defendants appears in any way to anticipate the new combination of Schreyer.

In assailing the validity of the claims in suit, defendants assert that they set forth mere aggregations of elements known to the prior art and that the resulting product is not of sufficient novelty to attain the status of patentability. The question raised by this line of defense is the familiar one of whether the device is a "combination" which has come to connote patentability, or an unpatentable "aggregation". As recently noted by the Supreme Court, "The concept of invention is inherently elusive when applied to combination of old elements", Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 151, 71 S.Ct. 127, 129. The reduction of the criteria of patentability to verbal formulae does not eliminate the elusiveness of the concept; nor is it easy neatly to bracket the field of patentable discovery within pre-defined limits. Circumstances surrounding the development of the patent and the state of the art which it purports to advance are factors which must be considered. Judge Learned Hand has counseled that "Courts, made up of laymen as they must be, are likely either to underrate or to overrate, the difficulties in making new and profitable discoveries in fields with which they cannot be familiar; and, so far as it is available, they had best appraise the originality involved by the circumstances which preceded, attended and succeeded the appearance of the invention. Among these will figure the length of time the art, though needing the invention, went without it: the number of those who sought to meet the need, and the period over which their efforts were spread: how many, if any, came upon it at about the same time, whether before or after: and perhaps most important of all—

164

the extent to which it superseded what had gone before." Safety Car Heating & Lighting Co. v. General Electric Co., 2 Cir. 1946, 155 F.2d 937, 939. The steam iron art had long sought to solve the problems inherent in the use of the screw-type filler plug; others had made ingenious attempts to eliminate the problem as evidenced by Theilgaard and the Challenger and Press Master models but, as previously indicated, none had hit upon a satisfactory solution. The Schreyer discovery overcame the disadvantages of the screw-type plug in a new and previously undiscovered manner. The inherent worth of his contribution to the art is attested to by the commercial success of the Steam-O-Matic iron produced under his patent,[1] and by the further fact that the defendant Casco, a newcomer to the iron industry, deemed it advisable to use the essential elements of the Schreyer idea in the model which it put into manufacture.

■ It has frequently been said that a patentable invention must incorporate innovations of a higher order than those that would occur to a mechanic skilled in the art. Pearce v. Mulford, 1880, 102 U.S. 112, 26 L.Ed. 93; Hollister v. Benedict & Burnham Mfg. Co., 1885, 113 U.S. 59, 5 S.Ct. 717, 28 L.Ed. 901; Sachs v. Hartford Electric Supply Co., 2 Cir., 1931, 47 F.2d 743. The new device to be patentable "must reveal the flash of creative genius not merely the skill of the calling". Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, 91, 62 S. Ct. 37, 41, 86 L.Ed. 58. Applying these rather strict standards to the invention here before us, it appears that Schreyer's device is a manifestation of something more than routine mechanical skill, that it is a product of ingenious creativeness deserving of the protection of our patent laws. The innovation was not a routine mechanical change in the structure of the prior art steam irons, it was a fundamental rearrangement of the various elements of the old type irons, achieving a new result.

No one prior to Schreyer had hit upon the idea of combining a safety-valve type of closure with a hinged handle. The idea was of sufficient novelty and creative originality to attain the status of patentability.

In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra, a combination patent on a cashier's counter, of the kind used in self-service markets, equipped with a slidable rack to permit the cashier to pull groceries into position was held invalid. The Court took occasion to lay down certain standards to determine the validity of combination patents. It was there said that "The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable" * * * "A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men." The Schreyer patent would seem to survive these rigorous standards; the combination of elements familiar to the steam iron industry constitutes contribution to the art. The old elements in combination fulfill new functions; the hinged handle, for instance, acts as a mount for the closure device and the closure mounted thereon serves as a safety valve. In no sense could the elements, united as they are here be classed as "what already is known". The claims in suit relating to the closure device, the hinged shield bearing the handle, the filler opening and the special latch (Claims Nos. 1, 2, 3, 4, 6, 7, 8, 11, 12 & 14) are accordingly held valid.

■ Claim No. 18, unlike those heretofore discussed, does not involve the closure mechanism. It specifies "a shell having a flexible floor plate welded thereto" and "means affixing said boiler to said sole plate whereby expansion or contraction of said floor plate relative to the sole plate on

---

1. Commercial success is a factor favoring patentability where it appears that the improvement of the patent is responsible for that success. De Mayo Coaling Co.

v. Michener Stowage Co., 2 Cir., 1916, 231 F. 736; Doig v. Morgan Mach. Co., 2 Cir., 1903, 122 F. 460; Kurtz v. Belle Hat Lining Co., 2 Cir., 1922, 280 F. 277.

which it is mounted occurs without springing said weld". This claim, differently phrased, was incorporated as Claim No. 44 in the original patent application and was rejected by the Patent Office, because of its anticipation in the Wolcott patent (2,-309,427, 1943). Thereafter, it was reworded and allowed by the Patent Office. It appears that the claim as presently set forth introduces nothing which was not known to the prior art by virtue of the Wolcott invention. Claim No. 18 is, therefore, invalid.

■ In addition to their defense of invalidity of the Schreyer patent defendants have set up a further defense of non-infringement. Where, as here, a combination patent is involved, there is no infringement unless the accused device includes in identical or substantially identical form all the essential elements of the combination. Water-Meter Co. v. Desper, 1879, 101 U. S. 332, 25 L.Ed. 1024; Vibroplex Co. v. J. H. Bunnell & Co., 2 Cir., 1927, 16 F. 2d 975; Harris v. Ladd, 8 Cir., 1929, 34 F.2d 761. The protection afforded by a valid patent is not strictly confined to the specific description of the invention therein set forth. A device similar to the patented one, incorporating its basic principles, infringes, though the copy makes some modifications or alterations in the original design. The "courts have * * * recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing." Graver Tank & Mfg. Co. v. Linde Air Products Co., Inc., 1950, 339 U.S. 605, 607, 70 S.Ct. 854, 856, 94 L.Ed. 1097. This so-called doctrine of equivalents was developed as a barrier to the practice of fraud on patents. The copyist cannot circumvent the patent by resort to mechanical equivalents serving the same functions as the elements in the patented device. "The accepted rubric", recognized by the Second Circuit, "is that to be an 'equivalent' the infringement must attain 'substantially the same result in substantially the same way'". Royal Typewriter Co. v. Remington Rand, Inc., 2 Cir., 1948, 168 F.2d 691, 692.

■ Competing with the doctrine of equivalents, which tends to enlarge the area of possible infringement is a counter rule calling for the narrow construction of patent claims in fields where there are many similar inventions. Duff v. Sterling Pump Co., 1882, 107 U.S. 636, 2 S.Ct. 487, 27 L.Ed. 517; Messler v. U. S. Rubber Co., 2 Cir., 1945, 148 F.2d 734. The steam iron art abounds in patents, each presumably contributing some improvement or innovation to the art. In such a field it is incumbent upon the Court closely to scrutinize the accused device and determine whether it corresponds to the claims of the patent when strictly construed. The doctrine of equivalents may still play its role even in the crowded field but it should not be so broadly applied as in cases where the patent introduces not an improvement but a completely new idea.

■ With one exception the differences between the Schreyer steam iron and the accused Casco iron are so slight and insubstantial as to call for a finding of infringement, even when the claims of the patent are strictly construed and the doctrine of equivalents is sparingly applied. It appears that the differences pertinent to the present action are five in number: (1) in the Casco iron the handle and shield plate are formed from a single piece of plastic, while in Schreyer the plastic handle is a separate part attached to a stainless steel shield plate; (2) in Casco the shield plate is hinged at a point farther to the rear of the iron than in Schreyer; (3) the closure plug in Casco is removable from the spring mounting, while in Schreyer the spring and plug are integral and are removable as a unit; (4) the Casco plug is not mounted on a sliding track as is the Schreyer; and (5) the Casco filler hole is shallower and does not have the vents in the lateral wall, which are one of the features of Schreyer's device. As to the first four of these differences, the change in the accused Casco is patently slight and inconsequential. Exactly the same result is reached whether the handle and shield are one part or two; moreover, it has been explicitly recognized that, making in one piece what the pat-

entee assembled in two, may constitute mechanical equivalence. F. A. Smith Mfg. Co. v. Samson-United Corp., 2 Cir., 1942, 130 F.2d 525. The slight change in the location of the hinge in the Casco model does not change in any way the operation of the shield-closure mechanism either in mode or result. The same may be said of the third and fourth variations relating to the method of removing the closure plug and its mounting on the shield. The fifth difference insofar as it relates to the vents in the filler well, however, is of a more substantial character. The purpose of these vents is to prevent a geyser reaction when cold water is introduced into the hot boiler of the iron. The Casco model, instead of copying the vents in Schreyer, solved the geyser reaction problem by using a metal lip integral with, and depending downward at an angle from, the lower rim of the funnel-shaped filler. The change is sufficient to warrant a finding of non-infringement of Claim No. 8, the only claim in suit which specifies "venting means in the wall of the lower part of" the filler opening. The other valid claims involved, Nos. 1, 2, 3, 4, 6, 7, 11, 12 and 14 are infringed.

We find no merit in defendants' claim of file-wrapper estoppel. The essence of their argument is that Schreyer, having given up the broader claims originally set forth in the application when they were rejected by the Patent Examiner and having accepted the more limited ones, is now estopped from setting up infringement of the invention as described in the broader claims, and that the allowed claims should be subject to a particularly strict construction. A similar argument was effectively answered by the Court of Appeals for the Seventh Circuit which stated: "That it was originally claimed in broader form, and that the claims were subsequently narrowed, lends no aid or support to appellant because it infringes the narrower claims. In such event there can be no file wrapper estoppel because appellant uses the process of the patent even though the cancelled claims broadly described the process." Ceramic Process Co. v. General Porcelain Enameling & Manufacturing Co.,

7 Cir., 1942, 129 F.2d 803, 806. Moreover, we have found that the claims, allowed by the Patent Office, even when narrowly interpreted, read on the Casco iron: "If accused matter falls clearly within the claim, infringement is made out and that is the end of it." Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., supra, 339 U.S. at page 607, 70 S.Ct. at page 855.

## II. Unfair Competition Issue.

Plaintiffs base an additional claim for relief on the alleged appropriation by defendants of trade secrets relating to the manufacture of the steam iron which plaintiffs claim were disclosed in confidence during the course of negotiations contemplating the formation of a license contract with defendants. The negotiations began in April of 1948 at a time when the patent application was pending in the Patent Office, and a Steam-O-Matic iron substantially identical to the electric steam iron disclosed in the patent application was being manufactured in Sandusky, Ohio by Waverly Products, Inc., a company owned by the Schreyer brothers. Through a business acquaintance, Milton Schreyer learned that Casco might be interested in manufacturing steam irons. He visited the Casco plant in Bridgeport and talked with Fenn, the executive vice-president, about a possible licensing arrangement. Fenn expressed interest in the proposition and Milton Schreyer later returned to talk to Cone who told him that Casco had been considering entering the steam-iron field and would be interested in taking a license from Edward Schreyer covering both the patent rights and the trade name Steam-O-Matic. Cone further indicated that he might purchase some of the equipment used in the Sandusky plant for the manufacture of the iron, if a satisfactory licensing agreement could be reached.

In early May, Cone, accompanied by Milton Schreyer and several Casco officials, flew to Cleveland to meet with Edward Schreyer and inspect the Waverly plant at Sandusky. Cone spent very little time inspecting the plant, seeing it at a time when it was not in operation. He did, however, take notice of the type of ma-

chinery in the plant with which he testified he was already familiar. While in Ohio Cone also visited the Dickey-Grabler plant in Cleveland where parts of the Steam-O-Matic were manufactured. Negotiations continued in Bridgeport during May and a tentative agreement was drawn up providing for the grant of a license to Casco and the purchase by Casco from Waverly of certain items of equipment. Edward Schreyer, during the course of these negotiations, imparted to Cone and employees of Casco much information about the technique of manufacture of steam irons, and also provided them with a complete set of blueprints, the component parts of the Steam-O-Matic, blanks used in its manufacture, lists of suppliers of parts, cost records and data on the machinery, equipment and dies used in the manufacturing process.

The Schreyers in the initial phases of the negotiations had represented the financial condition of Waverly to be hopeful although it was temporarily short of cash. More and more liabilities of Waverly were revealed during the course of the conferences and it finally became apparent to Casco by early June that Waverly was in hopeless condition with liabilities of more than half a million dollars, exclusive of debts owed by the company to the Schreyer brothers. The negotiations terminated on June 6 without the formation of a license agreement.

Casco retained the blueprints for more than two months after negotiations were broken off. During this time it was actively engaged in developing an iron for production and by September had completed a test model.

■ The essential elements of plaintiffs' cause of action for unfair competition are three: (1) that there was a disclosure in confidence; (2) that the disclosure was of something novel; and (3) that defendants appropriated the information disclosed to their own use. De Filippis v. Chrysler Corp., D.C.S.D.N.Y.,1944, 53 F.Supp. 977, 980. The parties are in agreement on this basic statement of the law, but defendants deny that plaintiffs

have established any one of the three essentials set forth.

The Schreyers maintain that there was an express agreement that the information relating to the manufacture of the Steam-O-Matic which was turned over to Cone and his associates should be held in strict confidence. Defendants do not admit to any such agreement but take the position that the only secrecy connected with the negotiations was a desire on the part of the Schreyers to conceal from the Waverly employees the nature of the visit of the Casco representatives. The fear was that the employees might leave their jobs if they knew that Waverly was contemplating a sale of its equipment.

■ Resolving the factual controversy in favor of the defendants, thereby finding the absence of an express agreement to hold in confidence, the circumstances under which the disclosures were made would, nevertheless, appear to impose upon the defendants an implied obligation not to use the information disclosed unless the negotiations resulted in a license contract. Trade secrets revealed to a prospective purchaser during the course of negotiations cannot be appropriated by the prospective purchaser if the negotiations fail. The law recognizes trade secrets as a species of property right and protects them by enforcing "certain * * * rudimentary requirements of good faith". Du Pont de Nemours Powder Co. v. Masland, 1917, 244 U.S. 100, 102, 37 S.Ct. 575, 576, 61 L.Ed. 1016; Schavoir v. American Re-Bonded Leather Co., 1926, 104 Conn. 472, 475, 133 A. 582. It was clearly not within the contemplation of the parties to the negotiations that Casco should make use of the trade secrets revealed whether or not a licensing agreement should be entered into. The rudimentary requirements of good faith would seem to dictate a conclusion that information revealed in such circumstances as these we are considering is confidential. We agree with the view of the court in Hoeltke v. C. M. Kemp Manufacturing Co., 4 Cir., 80 F.2d 912, 923, which in considering an argument similar to that made by the defendants here stated: "It is argued that there was

no confidential relationship existing between complainant and defendant with respect to the disclosure of the complainant's invention; but this contention is groundless. Complainant offered to disclose his invention to defendant with a view of selling it to defendant, and so stated in his letter. Defendant was interested in the proposition and invited the disclosure, otherwise it would not have seen complainant's specification and drawings until the patent was granted. While there was no express agreement that defendant was to hold the information so disclosed as a confidential matter and to make no use of it unless it should purchase the invention, we think that in equity and good conscience such an agreement was implied; and having obtained the disclosure under such circumstances, defendant ought not be heard to say that there was no obligation to respect the confidence thus reposed in it."

Defendants seek to relieve themselves of the obligations imposed by the confidential relationship by invoking the principle that once an invention has been patented, its secrets fall into the public domain. The information disclosed in confidence must no longer be held secret, they contend, once it has been made public by the issuance of a patent. Conmar Products Corp. v. Universal Slide Fastener Co., 2 Cir., 1949, 172 F.2d 150.

From the patent specifications defendants could have copied or deduced substantially all of the confidentially disclosed information which they used to their advantage. The defense, while partially valid, does not excuse defendants for the utilization of the confidential information prior to the issuance of the patent in July, 1949, during a period of experimentation when it was of especial value to them.

It is further asserted in defense of the unfair competition claim that the information disclosed by the Schreyers was not of sufficient novelty to be entitled to the protection afforded to trade secrets. The Restatement of Torts, in defining trade secret, states that it "may consist of any formula, pattern, device or compilation of information which is used in one's business, and

which gives him an opportunity to obtain an advantage over competitors who do not know or use it". Sec. 757, Comment (b). The blueprints, blanks, lists of suppliers, cost data and information on manufacturing technique would seem to fall within the trade secret classification. It is true that matters which are completely disclosed by goods on the market are not trade secrets. Mycalex Corp. v. Pemco Corp., D.C.Md. 1946, 64 F.Supp. 420. Relying on this proposition, the defendants contend that all the information revealed by the blueprints and blanks could have been ascertained by careful analysis of the Steam-O-Matic iron which was obtainable on the market. By measuring the component parts, they say, blueprints could have been prepared and the most efficient productive method deduced. The fact remains, however, that the defendants took unwarranted advantage of the confidence which the Schreyers reposed in them and obtained the desired knowledge without the expenditure of money, effort and ingenuity which the experimental analysis of the model on the market would have required. Such an advantage obtained through breach of confidence is morally reprehensible and a proper subject for legal redress. See A. O. Smith Corp. v. Petroleum Iron Works Co., 6th Cir., 1934, 73 F.2d 531.

The case of Tabor v. Hoffman, 1889, 118 N.Y. 30, 23 N.E. 12, 13 lends support to this conclusion. There an inventor who had developed a new type of pump had made a complete set of patterns to aid in its manufacture. The pump was on the market but the patterns had not been publicly disclosed. The patterns were taken to a repairman who surreptitiously made up a duplicate set for defendants to be used in the manufacture of an identical pump. The Court held for the inventor, even though it would have been possible through experimentation to duplicate the patterns from the pump on the market. The Court said "The fact that one secret can be discovered more easily than another does not affect the principle. Even if resort to the patterns of the plaintiff was more of a convenience than a necessity, still, if

there was a secret, it belonged to him, and the defendant had no right to obtain it by unfair means, or to use it after it was thus obtained."

The defendants deny use or appropriation of trade secrets. It is not controverted, however, that the blueprints were retained by Casco for more than two months after the termination of negotiations, during a period when the Casco personnel were intensively engaged in experimental work on development of a steam iron. The blueprint of the Calrod Unit was admittedly copied and used in an order to Yale and Towne Manufacturing Company. Cone recognized that this use was unethical and known by his associates to be unethical. It does not appear that the defendants used the list of suppliers which the Schreyers produced to any considerable extent.

 The circumstances of the case lead to an inference that there was an appropriation by Casco of secret information in abuse of confidential relationship. The evidence introduced in defense of the unfair competition claim does not overcome the inference. Casco, even before the war, had displayed some interest in entering the steam iron field and had made some preliminary investigations of patents. Not until the negotiations with the Schreyers, however, did Casco start in earnest on a program of development of a steam iron. A short while after the termination of the negotiations, a test model was developed and in about a year a Casco steam iron was on the market. This iron is so similar in design to Schreyer's Steam-O-Matic, as more particularly set forth in our consideration of the patent phase of the case, as to create an inference that defendants made use of the blueprints, components, blanks and manufacturing "know-how" which had been disclosed to them in confidence. "(O)ne who admittedly receives a disclosure from an inventor, proceeds thereafter to manufacture articles of similar character, and, when called to account, makes answer that he was using his own ideas and not the ideas imparted to him" should be required to sustain his defense with proof which is "clear, satisfactory, and beyond a reasonable doubt", Hoeltke

v. C. M. Kemp Manufacturing Co., supra, 80 F.2d at page 923. The Supreme Court has recently recognized it as proper to infer in the absence of some explanation that a process or product which closely resembles another is an imitation of the original and not a development of independent research. Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., supra. Since defendants have not met the inference which the facts in evidence create, we conclude that there was an appropriation of the confidential information.

 The plaintiffs seek an order enjoining defendants from making further use of the information obtained through breach of confidence, an accounting of profits and damages. In this case we feel that the only appropriate remedy is an accounting. The information confidentially disclosed became available to the public generally when the patent issued in July, 1949. Conmar Products Corp. v. Universal Slide Fastener Co., supra. Its present use cannot, therefore, be restrained by injunction. Plaintiffs are, however, entitled to redress for Casco's appropriation of the information before the patent issued. The corporate defendant must account for all profits resulting from, and attributable to, the use of the information confidentially imparted to it from the time of its disclosure to the date of the issuance of the Schreyer patent. The use of this information during the experimental stages was an advantage to defendant and made it possible for the corporate defendant to have its iron on the market at about the same time that the Schreyer patent issued. It is for the profits arising from this advantage that it must account.

 Plaintiffs seek relief against the defendant Cone individually on the theory that as the dominant influence in Casco, he was personally responsible for the infringement and the unfair competition. It is admitted that Cone owns or controls two-thirds of the Casco stock and as president takes an active part in the management of the business. There is no evidence that Casco is not a bona fide corporation and none that Cone's activity in connection with the patent was beyond the

scope of his authority as a corporate officer. "Under the authorities in this (Second) Circuit the corporate officer cannot be held personally responsible as an infringer unless he is shown to be acting beyond the scope of his authority, or is found to be conspiring to infringe under cover of the corporation, or using the corporation as a cloak to carry on infringement of others' patents. And usually insolvency of the corporation needs also to be shown." Steiner Sales Co. v. Darman Mfg. Co., D. C.N.D.N.Y., 1940, 33 F.Supp. 422, 430. There is no personal liability on the part of the defendant Cone.

Form of decree in accordance herewith may be submitted on ten days' notice.

### Findings of Fact

1. This is an action for infringement of Claims Nos. 1, 2, 3, 4, 6, 7, 8, 11, 12 and 18 of Schreyer Patent No. 2,475,572, applied for January 27, 1948 and issued July 5, 1949, and for unfair competition based on defendants' copying of the ideas embodied in the patent, revealed during negotiations prior to issue of the patent for the production of the iron under license.

The patent is for an electric steam iron. The claims in suit are printed in footnote No. 1 attached to these findings.

2. Claims Nos. 1, 2, 3, 4, 6, 7, 8, 11, 12 and 14 involve invention and are valid.

3. Claim No. 18 does not involve invention and is invalid.

4. Claims Nos. 1, 2, 3, 4, 6, 7, 11, 12 and 14 are infringed by the Casco iron, manufactured and sold by defendant Casco.

5. Claim No. 8 is not infringed by the Casco iron.

6. During the period referred to herein, defendant Casco was under the direction and control of defendant Cone.

7. The inventor, Edward Schreyer, and his brother Milton, were, early in 1948, owners of Waverly Products, Incorporated, which had manufactured an earlier model Steam-O-Matic iron under patents of Edward Schreyer and had begun the manufacture of the new R500 iron under the application for patent which ripened into the patent in suit.

8. Most of the parts of the R500 iron were manufactured for Waverly Products by outside manufacturers who used tools, dies, jigs, and fixtures belonging to Waverly Products, for the parts manufactured, Waverly Products then assembling the iron at its plant at Sandusky, Ohio.

9. Waverly Products was in serious financial difficulties, having reached a condition of insolvency, without consideration of over $200,000 owed by it to Edward Schreyer for royalties and some $200,000 owed to the two Schreyers for money advanced by them to the corporation.

10. In April, 1948, Milton Schreyer, as a result of a conversation with an acquaintance who knew that Casco was seeking new household-appliance lines to manufacture, went to see Fenn, an employee of defendant Casco, at the Casco plant in Bridgeport, Connecticut.

11. Fenn was interested in the iron and suggested that Milton Schreyer see the defendant Cone, who controls Casco, upon Cone's return from Florida.

12. Milton Schreyer did so, conferring with Cone about April 28, 1948, when arrangements were made to have Cone and some of Casco's men go to Sandusky to inspect the Waverly Plant.

13. This was done May 4, 1948, Cone looking over the plant and the assembly operations and manufacturing operations at Sandusky and also looking over the operations of a supplier in Cleveland who was stamping out the sheet metal boiler parts for Waverly.

14. Two of Casco's men spent portions of two days in analyzing the operations at the Sandusky plant for a cost-of-production study.

15. Milton Schreyer held more conferences with Cone during May.

16. A complete list of the suppliers of parts to Waverly was furnished to Casco with the costs of the various items, for checking by Casco.

17. Complete irons and blueprints and samples of all parts which went into the iron were furnished to Casco.

18. On June 4, 1948, the Schreyers returned to Bridgeport to continue negotia-

tions for production of the iron by Casco under a license.

19. Cone had difficulty in arriving at a decision on which portions of the machinery of Waverly would be useful to him and would be purchased by Casco.

20. It transpired during conferences on June 4 and 5 that the financial condition of Waverly was even more critical than Cone had been informed.

21. Consideration was given to a plan to have Casco agree to produce the iron on a royalty agreement with Edward Schreyer and purchase whatever machinery was needed or useful on a sale in bankruptcy of Waverly's assets, to split with Edward Schreyer any profit realized from purchase and sale of Waverly's assets as a result of the bankruptcy.

22. A contract in these terms was drawn up but negotiations at this point broke down, the Schreyers deciding, on June 6, to put Waverly through a Chapter XI reorganization.

23. Thereupon Cone determined to go ahead with the manufacture of a steam iron by Casco and did so, utilizing the knowledge of the steam iron problems and possible solutions of some of them obtained during the negotiations with Schreyer.

24. Some of Waverly's or Schreyer's blueprints were used in obtaining parts, notably the heating element for the sole-plate for the development work on the new Casco iron.

25. Casco had done some work on electric irons prior to the dealings with Schreyer but had not made any serious study or attempts at development of electric steam irons until the Schreyer negotiations broke down, the first draftmen's work beginning July 27, 1948.

26. By that time the Schreyer irons were on the market.

27. It would then have been possible to duplicate the parts and place a similar iron in production by Casco in a period of six months after the publication of the Schreyer patent, upon purchase and analysis of one of the Schreyer irons which were then on the market.

28. Casco made some changes in the design of the iron, utilizing a different type thermostat, slightly changing the make-up and attachment means of the closure and safety-valve plug from the Schreyer design, changing the shape of the sole-plate, using baffles instead of steel wool to prevent surging of water when the iron was in use, carrying the boiler shell the length of the iron to contain the electrical controls and dial where Schreyer attached a separate shell piece at the rear of the boiler, and making some other minor changes.

29. The principal improvement of the Schreyer patent over the prior art was the combination of a large filler opening on top of the boiler, held closed by a filler plug which would be held in place when in a closed position by a spring, which spring would allow it to yield to excessive steam pressure and thereby act as a safety valve, the closure device being mounted under, and traveling with, a shield fitting over the top of the boiler, to which the handle of the iron is affixed, the whole lifting or swinging up from the boiler top on a hinge at or near the rear of the boiler and being held in place when the iron is in use by a latch near the front of the handle.

30. The essential ideas were taken from Schreyer or Waverly by Casco and used in the development of its own iron.

31. Casco could have lifted the ideas from the patent and from commercial models on sale.

32. Casco actually did obtain some advantage in its own development work by making use of the information given it in confidence.

### Conclusions of Law.

1. The Court has jurisdiction of the parties and subject matter of the action.

2. Claim No. 18 of the Schreyer patent No. 2,475,572 is invalid for lack of invention.

3. Claim No. 8 of the Schreyer patent is valid but not infringed by the accused Casco iron.

4. Claims Nos. 1, 2, 3, 4, 6, 7, 11, 12 and 14 of the Schreyer patent No. 2,475,-

572 are valid and infringed by the accused Casco iron.

5. The accused Casco iron was designed and produced by defendant Casco in violation of the confidence of plaintiff Schreyer.

6. Plaintiffs are entitled to an accounting of damages from the defendant Casco from the use of the Schreyer invention, and are entitled to an injunction prohibiting further use of the Schreyer invention by the defendant.

7. There is no personal liability on the part of the individual defendant Cone.

## Judgment

There are three points in disagreement between the parties as to the form of judgment; first, the elements to be considered in accounting for the unfair competition, second, the necessity for a supersedeas bond, and third whether attorneys' fees should be awarded.

The unwarranted use of the confidential information enabled the corporate defendant to place its iron into production and on the market at an earlier date than would have been possible if it had relied on independent research. It is true that no profits actually accrued to defendant prior to the issuance of the Schreyer patent and that the use of the confidential information ceased to be a wrong as against plaintiffs on the date of issue of the patent. The profits for which the corporate defendant must account in the unfair competition phase of the case are those resulting from acceleration of the date when production was possible, these profits being directly attributable to the wrongful use of the information. The words "gains and advantages" will be retained in the final form of judgment.

The injunction may be stayed pending appeal on filing a supersedeas bond in the amount of $10,000, defendant to report to plaintiff the number of irons manufactured each month pending appeal.

Attorneys' fees will not be allowed under the circumstances of this case, since the claims of invalidity and non-infringe-

ment are not held to have been made in bad faith. See Lincoln Electric Co. v. Linde Air Products Co., D.C.N.D. Ohio, 1947, 74 F.Supp. 293.